**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and HOWARD McDOUGALL, Trustee,** ) ) ) ) | |
| **Plaintiffs,** ) ) | |
| **v.** ) ) | **No. 09 C 1445** |
| **GEORGIA-PACIFIC LLC, a Delaware limited liability company,** ) ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Central States, Southeast and Southwest Areas Pension Fund, a multiemployer pension fund, and one of the fund's trustees, Howard McDougall, (collectively "Central States") brought this action under the Employee Retirement and Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking to collect withdrawal liability from Defendant Georgia-Pacific LLC, a large manufacturer and distributor of tissue, pulp, paper, packaging and building products. After Georgia-Pacific withdrew from the Central States Pension Fund, the fund assessed $5 million in withdrawal liability. An arbitrator vacated that assessment, ruling that the withdrawal occurred "solely because" of Georgia-Pacific's sale of its building division to a new owner who continued to make contributions to the fund. Central States challenges the arbitrator's ruling and moves to vacate or modify it. Georgia-Pacific moves to enforce the ruling. For the reasons that follow, Georgia-Pacific's motion is granted and Central States's motion is denied.

<u>**FACTUAL BACKGROUND**</u>[1]

From 1994 to 2004, Georgia-Pacific contributed to Central States on behalf of some employees in its Pulp and Paper Transport Division and its Building Products Distribution Division.

---

[1]     The facts in this section are taken primarily from the arbitrator's findings of fact, which rely on facts to which the parties stipulated.

*Georgia Pacific LLC v. Central States, Southeast & Southwest Areas Pension Fund*, AAA Case No. 51 621 0616 08, at 1 (Mar. 3, 2009) (Glanzer, Arb.). Georgia-Pacific outsourced the Pulp and Paper Transport Division's transportation needs in 1994 and then closed the division entirely in 1995. *Id.* at 2. As a result, Georgia-Pacific reduced its contributions to Central States. The Multiemployer Pension Plan Amendment Act of 1980 (MPPAA), 29 U.S.C. §§ 1381-1453, a series of amendments to ERISA, governs the consequences of an employer's withdrawing from a multiemployer plan. Generally speaking, the withdrawing employer must pay "the difference between the present value of vested benefits and the current value of the plan's assets," an amount referred to as "withdrawal liability." *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381, 1391). After a qualifying withdrawal, the plan sponsor calculates the amount of withdrawal liability, notifies the employer of the amount owed, and demands payment. 29 U.S.C. § 1399(b)(1); *Chicago Truck Drivers v. El Paso CGP Co.*, 525 F.3d 591, 595 (7th Cir. 2008). Central States determined that Georgia-Pacific's outsourcing of some jobs and the closing of the Pulp and Paper Transport Division did not trigger withdrawal liability. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 2. Although the reason for this determination is not addressed in the record, the court presumes that the reduction in fund contributions due to the 1994 outsourcing and 1995 closure was not deemed a withdrawal because Georgia-Pacific continued making contributions for a large number of employees.

From 1994 to 1997, Georgia-Pacific underwent additional restructuring, namely facility closures in the Building Products Distribution Division. *Id.* This additional restructuring resulted in a further reduction in Georgia-Pacific's contributions to Central States, which Central States determined did require payment of partial-withdrawal liability under ERISA § 4205, 29 U.S.C. § 1385. Georgia-Pacific agreed and paid $81,585.62 in partial-withdrawal liability. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 2.

In 2000, Georgia-Pacific announced in a letter to shareholders that it was changing its

corporate strategy to focus on higher-margin businesses closer to its customers and core competencies. (Arb. Record, Tab 77 to Tab 7, at 2.) The new strategy involved reducing corporate debt, which Georgia-Pacific accomplished, in part, by selling off some of its operations. *Id.* The new strategy was not completely successful in reducing Georgia-Pacific's debt, and, in 2003, the company saw its investment rating downgraded. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 3. In a 2003 letter to shareholders, Georgia-Pacific stated its goal of improving its investment grade by further reducing debt. (Arb. Record, Tab 81 to Tab 7, at 3.) Its 2004 sale of the Building Products Distribution Division helped in that goal by reducing the company's debt by close to $2 billion. (Arb. Record, Tab 82 to Tab 7, at 3.) As a 2004 SEC filing explains, the sale of the Building Division was also consistent with the corporate strategy adopted in 2000. (*Id.*, at 5.)

After the sale, Georgia-Pacific and the purchaser, a company now known as BlueLinx, informed Central States that Georgia-Pacific had sold the Building Products Distribution Division through a sale governed by ERISA § 4204, 29 U.S.C. § 1384, rendering it exempt from withdrawal liability. Central States initially agreed that the sale complied with § 4204. *Id.* at 3-4. Under that section, an employer is exempt from withdrawal liability if, among other requirements, the withdrawal is "solely because" of an asset sale and the purchaser promises to continue to contribute to the fund. *See Central States, Southeast & Southwest Areas Pension Fund v. Nitehawk Express, Inc.*, 223 F.3d 483, 487-88 (7th Cir. 2000).

Two and a half years later, Central States revised its position and sent Georgia-Pacific a notice and demand for payment of $5,161,930.31 in withdrawal liability. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 4. Central States based this assessment on Georgia-Pacific's contribution history for employees in the Pulp and Paper Transport Division and the Building Products Distribution Division; the contribution excluded contribution history for employees whose contribution responsibilities were assumed by BlueLinx in the asset purchase. *Id.* An employer may challenge a pension fund's assessment of withdrawal liability by asking the fund to review its

assessment and then seeking arbitration, 29 U.S.C. §§ 1399(b)(2), 1401(a)(1), and that is what

Georgia-Pacific did. Before the arbitrator, Central States argued that the § 4204 exemption did not

apply because, based on Georgia-Pacific's reduced contributions before the asset sale, the sale

was not the sole reason for the complete withdrawal. *Georgia Pacific*, AAA Case No. 51 621 0616

08, at 5-6. Georgia-Pacific argued that the prior reductions should not be considered because they

were not related to the sale. *Id.* at 6.

The arbitrator sided with Georgia-Pacific. First, the arbitrator rejected Central States's

interpretation of § 4204, reasoning that an employer's withdrawal from a fund can be "solely

because" of an asset sale even where prior action by the company resulted in reduced contributions

that were not due to an asset sale. *Id.* at 8-9. The arbitrator ruled that Central States's

interpretation would make it too difficult for employers to take advantage of the exemption, thereby

frustrating Congress's intent to avoid deterring asset sales. *Id.* at 8-10. If selling a division imposed

a cost that holding the division would not impose, companies would be reluctant to make  asset

sales. *Id.*

Next, the arbitrator relied on the analysis adopted by the Pension Benefit Guaranty

Corportation to determine whether the asset sale was the sole cause of Georgia-Pacific's

withdrawal. *Id.* at 15-18. That is, the arbitrator examined the facts and circumstances of the case

to determine the connection between the asset sale and the earlier events by relying on the

following factors: "the length of time between transactions, whether the transactions were related,

and whether such transactions would have been subject to Section [4204] if viewed individually."

PBGC Opinion  Letter 92-1, 1992 WL 425182, at *3 (Mar. 30, 1992). The arbitrator noted that the

length of time between the three earlier events, which occurred in 1994, 1995, and 1997, and the

2004 asset sale, supported treating the events as distinct. *Georgia Pacific*, AAA Case No. 51 621

0616 08, at 16. Next, the court found that there was "no common scheme or pattern among" the

different events. *Id.* at 17-18. The closings in 1994 and 1995, which were motivated by "insurance

4

liability exposure and capital restraints," were in a different division than the 2004 sale. *Id.* at 17.

And the 1997 closures, though in the same division as the later sale, were motivated by "market

conditions adversely affecting Georgia-Pacific's share." *Id.* at 17. In contrast, the 2004 sale was

part of an independent "effort to reduce debt and divest the company of non-core assets." *Id.* at

18. Because the 2004 sale was removed in time from the prior acts and motivated by distinct

business considerations, the arbitrator ruled that the withdrawal was solely because of the sale and,

therefore, Georgia-Pacific was entitled to the exemption. *Id.*

Central States brought suit in this court under ERISA § 4221(b)(2), 29 U.S.C. § 1401(b)(2),

which, in accordance with ERISA § 4301, 29 U.S.C. § 1451, gives district courts the power to

review an arbitrator's award. Georgia-Pacific answered, and now both sides have filed motions:

Central States seeks to have the award vacated and modified while Georgia-Pacific seeks to have

the award enforced.

## ANALYSIS

When reviewing an arbitrator's ruling on withdrawal liability, the arbitrator's factual

determinations are presumed correct and may be overturned only if they are against the "clear

preponderance of the evidence," 29 U.S.C. § 1401(c), a standard the Seventh Circuit interprets as

a "clearly erroneous" standard. *Central States, Southeast & Southwest Areas Pension Fund v.*

*Midwest Motor Express, Inc.,* 181 F.3d 799, 804-05 (7th Cir. 1999). The arbitrator's legal

conclusions are reviewed de novo. *Id* at 805. And the issue of whether the arbitrator properly

exempted Georgia-Pacific from withdrawal liability is a mixed question of law and fact subject to

clear-error review. *Nitehawk Express*, 223 F.3d at 488. Under that standard, a finding is clearly

erroneous only "if the reviewing court, after acknowledging that the factfinder below was closer to

the relevant evidence, is firmly convinced that the factfinder erred." *Id.* at 488-89. The court notes

that although this standard calls for deferential review, it is a less deferential standard than the one

that normally applies under the Federal Arbitration Act. *Id.* at 488 n.2.

In its motion, Central States renews its arguments that Georgia-Pacific is not exempt from withdrawal liability because its withdrawal did not occur "solely because" of its sale of assets to BlueLinx in 2004. Under ERISA 4204(a)(1), 29 U.S.C. § 1384(a)(1), a "complete or partial withdrawal of an employer . . . does not occur solely because, as a result of a bona fide, arm's-length sale of assets to an unrelated party . . . the seller ceases covered operations or ceases to have an obligation to contribute for such operations." The arbitrator relied on PBGC Opinion Letter 92-1 to assess whether the withdrawal was "solely because" of the asset sale. In relevant part, the letter explains that

> [w]hether a decline in contributions is solely because of a covered restructuring
> must be determined on the facts and circumstances of each case and should be
> addressed by arbitration subject to review by the courts. Relevant considerations
> might include the length of time between transactions, whether the transactions
> were related, and whether each transaction would have been subject to Section
> [4204] if viewed individually.

PBGC Opinion Letter 92-1, 1992 WL 425182, at *3 (Mar. 30, 1992).

Georgia-Pacific argues that the this court should give the same deference to the letter that the arbitrator did. (Def's Br., at 17-18.) Opinion letters have persuasive authority only, but the court notes that this particular letter, Opinion Letter 92-1, is one the Seventh Circuit has explicitly relied on in the past, albeit for different purposes. *CenTra, Inc. v. Central States, Southeast & Southwest Areas Pension Fund*, 578 F.3d 592, 601 (7th Cir. 2009); *Nitehawk Express*, 223 F.3d at 491. Central States contends that the Seventh Circuit refused to apply Opinion Letter 92-1 in *Central States, Southeast & Southwest Areas Pension Fund v. Sherwin-Williams Co.*, 71 F.3d 1338 (7th Cir. 1995), but the court merely stated that it disagreed with an *apparent assumption* in the letter. *Id.* at 1342. In the same opinion, the court relied on a different section of Letter 92-1 and on another PBGC opinion letter as persuasive authority. *Id.* at 1339, 1342. This court will treat Letter 92-1 in the same way.

Central States begins its substantive argument against the reasoning of the PBGC opinion

letter by contending that the letter improperly applies a proximate-cause analysis rather than a sole-cause analysis. (Pls' Memo, at 11-13.) In support, Central States cites *Adkins v. Trans-Alaska Pipeline Liability Fund,* 101 F.3d 86 (9th Cir. 1996), in which the Ninth Circuit described a determination of proximate causation based on "remoteness in time, place, and like factors." *Id.* at 88. Those factors do bear some resemblance to the ones considered by the arbitrator in reliance on the opinion letter, but crucially, the arbitrator considered them for a different purpose. The proximate-cause inquiry considers the connection between "the act or omission of the defendant and the damage which the plaintiff has suffered." W. KEETON ET AL., PROSSER & KEETON ON THE LAW OF TORTS § 41, at 263 (5th ed. 1984). Here, though, there is no dispute that Georgia-Pacific's asset sale was a proximate cause of its withdrawal. Rather than considering the connection between an act and a harm, the arbitrator's analysis of the question whether the sale was the sole cause of the withdrawal considered the connection between the sale and other events that might be considered causes of the withdrawal. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 16-18. Because those potential causes were so separate in time and motivation, the arbitrator ruled that they did not contribute to the withdrawal, so the sale was the sole cause. *Id.* at 18. The court is satisfied that the arbitrator did not engage in a proximate-cause analysis.

Central States next argues that the analysis applied by the arbitrator ignores the plain language of § 4204. (Pls' Memo, at 5-6, 12.) According to Central States, any inquiry into the connection between earlier events that contributed to the withdrawal and the asset sale itself means that the asset sale cannot be the sole cause of the withdrawal. This argument has some appeal: without the earlier closures, Georgia-Pacific's sale would not have caused a complete withdrawal, so how can the sale be the *sole* cause? The answer is that it can be the sole cause because the common use of the word "cause" does not include every single occurrence without which a final event could not take place. A criminal could not commit his crime without being born, but his birth is not a "cause" of his crime. *United States v. Dyer,* 216 F.3d 568, 570 (7th Cir. 2000). As the

7

Seventh Circuit has explained, but-for causation "often falls short of the meaning of 'cause' in ordinary usage." *Id.* "The event without millions of causes is simply inconceivable," W. KEETON ET AL. § 41, at 266, so *some* test must apply to determine which of those "causes" are legally significant. For an act to be the sole cause of an event, it need not be the only condition required for the event. A sole cause is the "only cause that, *from a legal viewpoint*, produces an event or injury." BLACK'S LAW DICTIONARY at 234 (8th ed. 2004) (emphasis added). The PBGC's test, which examines the facts and circumstances of each case to determine how closely related the earlier events are to the final one, is a sensible one for determining, "from a legal viewpoint," whether the latest event constitutes the sole cause of a withdrawal.

Thus, the court finds that the arbitrator applied the correct legal test to determine whether Georgia-Pacific's withdrawal was "solely because" of the asset sale. In anticipation of that possible ruling, Central States argues that the arbitrator applied the test improperly.[2] (Pls' Br., at 17-21.) Central States first addresses whether the earlier closures were exempt from withdrawal liability. (Pls' Br., at 18.) Indeed, those closures were not exempt from withdrawal liability, but the arbitrator properly recognized that fact. *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 15 (considering "whether the individual transactions considered separately would have been exempt" and concluding that they would not have been).

Central States next argues that the length of time between the closures and the sale should weigh in favor of its position. (*Id.* at 18-19.) The latest closure event in question was in 1997, seven years before the asset sale. Central States proposes that any period less than ten years

---

[2] Central States also argues that the arbitrator erred by failing to defer to the fund's finding on withdrawal liability, (Pls' Br., at 17), but the deference required under ERISA § 4221(a)(3)(A), 29 U.S.C. § 1401(a)(3)(A), applies only to the fund's factual determinations. *Joseph Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan,* 3 F.3d 994, 1000 (7th Cir. 1993) (*citing Concrete Pipe & Products of Cal., Inc. v. Construction Laborers Pension Trust for Southern Cal.*, 508 U.S. 602, 629 (1993)), *aff'd on other grounds* 513 U.S. 414. Because Central States' determination of withdrawal liability was a mixed legal and factual determination, the arbitrator was not required to defer to the fund's finding on that issue.

must weigh in its favor, but offers no authority for that proposition aside from two rulings in which liability was imposed in cases involving time periods close to seven years. *Penn Central Corp. v. Western Conference of Teamsters Pension Trust Fund*, 75 F.3d 529 (9th Cir. 1996); *TNT Canada, Inc. v. Central States*, *Southeast & Southwest Areas Pension Fund*, AAA Case No. 51 621 00068 97 (Nov. 2, 2000) (Brand, Arb.). Those rulings involved other distinct circumstances and contain no reasoning that would suggest that the arbitrator's use of the factor in this case was clear error. Accordingly, the court must defer to the arbitrator.

Third, Central States argues that the arbitrator was wrong to find that the asset sale was unrelated to the earlier closures. Central States contends that the closings of some facilities within the Building Division in 1997 and the sale of the entire division in 2004 were part of a "single, continually revised restructuring plan." (Pls' Br., at 20.) The arbitrator concluded otherwise, finding that the earlier closures were motivated by "market conditions adversely affecting Georgia-Pacific's share" and that the sale was part of an independent "effort to reduce debt and divest the company of non-core assets." *Georgia Pacific*, AAA Case No. 51 621 0616 08, at 17-18. Whether the events were related is a question of fact, on which the court will overturn the arbitrator only if his finding is clearly erroneous. 29 U.S.C. § 1401(c). Central States emphasizes testimony that the 1997 restructuring, which included the closures, was "tweaked" over the years, and urges that Georgia-Pacific failed to show that the asset sale was not another "tweak." (Pls' Br., at 20.) As Georgia-Pacific explains, though, the only actual "tweaking" testified to was in 1998, long before the change in strategy found by the arbitrator that separated the 1997 closures from the 2004 sale. (Def's Response Br., at 7.) Thus, the court will not disturb the arbitrator's finding that the asset sale and the earlier closures were unrelated. Based on that and the arbitrator's other findings, its ruling on withdrawal liability is not clearly erroneous.

Finally, the court addresses the parties' arguments over whether the arbitrator's ruling is consistent with the goals of ERISA § 4204. "In order to encourage asset sales, Congress excused

companies from withdrawal liability when they sold assets," but "Congress conditioned the seller's withdrawal exemption on the purchaser's assumption of a preexisting obligation to the plan." *Nitehawk*, 223 F.3d at 487-88. Congress's purpose—encouraging asset sales—would be frustrated, Georgia-Pacific argues, if an employer's sale of an asset forced it to incur withdrawal liability for past contribution reductions for which it would not incur liability absent the sale. (Def's Br., at 21-22.) Central States responds that its interpretation of the statute also creates incentives for asset sales because by complying with § 4204, Georgia-Pacific can avoid the portion of withdrawal liability related to the asset sold. (Pls' Br., at 22; Pls' Response Br., at 14-15.) If Georgia-Pacific had chosen instead not to sell the asset, though, there would be no withdrawal liability to avoid. Thus, Central States's comparison between withdrawal liability for a sale in compliance with § 4204 and withdrawal liability for a noncompliant sale is inapposite because it presupposes the sale itself. The proper comparison to determine whether asset sales are being encouraged is the liability that would be assessed with or without the sale, and that is the comparison on which Georgia-Pacific relies. The court agrees that the arbitrator's interpretation of the statute more closely conforms to Congress's goal of encouraging asset sales.

**CONCLUSION**

For the foregoing reasons, Plaintiffs' Motion to Modify or Vacate the Arbitrator's Decision [27] is denied. Defendant's Motion to Enforce Arbitrator's Decision [29] is granted.[3]

ENTER:

Dated: February 2, 2010

_____
REBECCA R. PALLMEYER
United States District Judge

---

[3]  In the last sentence of its response memorandum, Georgia-Pacific seeks attorneys' fees and costs. (Def's Response Br., at 15.) The court has discretion to refuse to consider an issue that is first raised in a reply brief, especially one raised without any development whatsoever. *Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009). In any event, the court must deny the request at this time because a claim for attorneys' fees "must be made by motion." FED. R. CIV. P. 54(d)(2)(A); *Bender v. Freed*, 436 F.3d 747 (7th Cir. 2006) (holding that Rule 54(d)(2) applies to fee requests under ERISA).